**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991  **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

### I. PURPOSE

This directive outlines the use of force for all Department employees.

### II. POLICY

The value of human life is immeasurable in our society. Police Officers are delegated the responsibility to protect human life and property and to apprehend criminal offenders. The apprehension of criminal offenders and the protection of property at all times must be secondary to the protection of human life, including the officer's own life.

It is the policy of the Department that a police officer acting in his official capacity, may discharge a firearm or use other deadly force toward a person only when the officer is legally justified to do so and the use of force complies with Department policy.

It is the policy of the Department that Public Safety Officers and crime scene personnel are authorized and trained to carry OC Spray for defensive purposes only. They should avoid confrontation and should retreat or leave the area if situations escalate.

It is the policy of the Department that an employee shall not use greater force than is reasonably necessary to complete their lawful duties.

While the use of force is occasionally unavoidable, employees will not inflict unnecessary pain or suffering on any person; nor will an employee engage in agitating, degrading, or inhuman treatment. Any employee that witnesses such behavior is obligated to report the behavior to a supervisor.

Newly hired Police Officers, Detention Officers and Public Safety Officers will be instructed in and issued a copy of this Directive prior to carrying any weapons.

The Confrontational Continuum in this Directive shall be used as a guide in making use of force decisions.

### III. DEFINITIONS

A. Baton Round – an extended range impact weapon, performing the same function as a hand held baton, except at extended ranges.

B. Less Lethal Force – A force applied in a situation where a person has the immediate ability and means to escalate a confrontation which will place an officer, a citizen, or the subject at risk of serious bodily injury or death. Less lethal force is applied with the intention to reduce or eliminate a threat but there is a statistical possibility that serious bodily injury or death may occur when this type of force is applied.

C. Police Officer – a sworn employee, licensed as a peace officer by the Texas Commission on Law Enforcement.

D. Detention Officer – an employee assigned to the Plano Municipal Jail having completed required training by the Department for said position.

E. Public Safety Officer – a uniformed non-sworn employee that may be assigned to any Division in the Department.

F. Crime Scene Personnel – an employee assigned to the Department Crime Scene Unit as a Criminalist or Criminalist Supervisor.

G. Employee – for the purpose of this policy the term "employee" means a Police Officer, Detention Officer, Crime Scene Personnel and / or a Public Safety Officer.

---

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**                    **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

---

- H. Reasonable Belief – a belief that would be held by an ordinary and prudent person in the same circumstances as the actor.

- I. Serious Bodily Injury – bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

- J. SL-6 SAGE Launcher – a six shot, semi-automatic launcher that launches a 37mm baton round.

- K. TASER – an Electronic Controlled Weapon that discharges, via compressed air, two contact probes connected by high voltage insulated wires that transmits a 26-Watt electrical signal to physically incapacitate a resisting person.

- L. Restraining Chair – a mobile unit designed to immobilize a violent prisoner safely in an upright position to prevent the prisoner from injuring themselves or others.  The restraining chair is equipped with the following safety features: back support padding, wrists restraints, leg restraints, buckle release cover and a transportation carriage.  The restraining chair is kept and used only in the jail.

- M. Immediate Deadly Threat – A perceived imminent threat in which an officer reasonably believes that he may use deadly force or the threat of deadly force, in order to prevent serious bodily injury or death to himself or another, and in accordance with Chapter 9 of the Texas Penal Code.

- N. Safety Circle – A geographical location that represents the safest direction to point a firearm in a real world or street environment. The "safety circle" is when the muzzle is pointed at the ground and inside a circular area about a yard in diameter inside of which the officer is standing or sitting. The muzzle is not pointed at any person.

IV. **PROCEDURES**

   A. The Confrontational Continuum

   Diverse factors influence an employee's decision on the appropriate force necessary to control a situation.  Because the use of force does not occur in a vacuum, it is impossible to list all factors that shape an employee's decision.  Age, physical size, relative strength, skill level and injury/exhaustion of the employee and the offender, as well as the number of employees versus the number of offenders are reasonable factors for an employee to consider when determining the appropriate use of force for a given situation.  Each situation is different and may require an employee to choose an appropriate level of force on the Confrontational Continuum, rather than progressing through each step in the Continuum.  **However, in every instance employees shall use only that force which is reasonably necessary to accomplish their lawful duties.** The levels of force are described in the Confrontational Continuum for the purposes of providing employees guidance in complying with the department's Use of Force Policy and include the following:

   1. Dialogue:  The most basic defensive measure available to an employee. Dialogue is used to persuade a person to cooperate.  "Talking" a person into compliance avoids the inherent dangers of a physical confrontation in which the employee or person may be injured.  Whenever possible dialogue should continue to be used at every level of the continuum.

   2. Escort Compliance:   This is a low-level, non-threatening and non-violent compliance procedure.  The purpose of an escort technique is to remove a person from an area where the person and/ or the employee may be in jeopardy.  This includes handcuffing of a compliant subject.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**                    **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

3. Pain Compliance:  When an escort technique fails or would be unsafe, the next force option is a pain compliance technique.  Pain compliance techniques include the manipulation of joints or pressure points to cause pain or the use of OC spray. Compliance results from an effort on the part of the person to relieve the discomfort.

4. Mechanical Compliance:  When pain compliance is ineffective, the next option is mechanical control.  Mechanical control includes the use of a punch, kick, throw, or stun. Mechanical control has a higher probability of gaining compliance, but there is also a higher potential of injury to the suspect.  As a result, mechanical control is used only in those circumstances in which the preceding levels of force are inappropriate due to the subject's behavior or have shown to be an ineffective means of control.

    a. Exception: A knee strike to the common peroneal nerve motor point to effect a takedown may be used as an authorized distraction technique. This technique is used when attempting to escort an individual and they attempt to resist. A knee strike used in this manner only as a distraction technique is considered a use of force at the Pain Compliance level.

5. Impact Weapon:  When mechanical compliance fails, is unsafe, or is an inappropriate use of force response, the use of an impact weapon is permitted.  Impact weapons are an intermediate level of force and bridge the gap between the use of mechanical compliance and the use of lethal force to control an assailant.

6. Less Lethal Options:

    a. Taser – A Taser is a less lethal force option which delivers electrical energy and can be deployed against subjects who have the immediate ability and means to escalate a confrontation which will place an officer, a citizen, or the subject at risk of serious bodily injury or death.  The Taser is used to incapacitate a subject allowing officers to take him or her into custody minimizing the risk of injury to all parties involved.  This level of force applies regardless of whether the Taser is fired or used in the drive stun mode.

    b. Sage – Sage is a less lethal force option which can be used with greater accuracy and at a greater distance to incapacitate individuals, control crowds and in mobile field force situations with less risk to the Police Officer's personal safety.  The use of less lethal ordnance and ammunition is decisive action that can assist in protecting life, restoring order, enabling an arrest and reducing the risk of more serious injury.  Less lethal ammunition may be used against subjects who have the immediate ability and means to escalate a confrontation which will place an officer, a citizen, or the subject at risk of serious bodily injury or death.

7. Lethal Force:  Force that, by design or under the circumstances in which it is used, is readily capable of causing serious bodily injury or death.  The phrase "deadly force" has the same meaning as lethal force.

B. Medical Assistance

Anytime force is used and the person is injured, complains of injury, or an injury is suspected, appropriate medical assistance shall be provided to the injured person.  The employee should continue to render first aid to the best of his/her ability and ensure that Emergency Medical Services (EMS) personnel are called to the incident scene or to the jail.

C. Prisoners at Higher Risk

1. Combative persons who have died in police custody exhibit "common characteristics" including:  intoxication (alcohol and drugs), violent or bizarre behavior, upper body obesity,

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991            **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

      profuse sweating, disrobing and other indicators of elevated body temperatures, and/or restraint in a prone position.

2. Upon recognition of a person exhibiting these traits, the Police Officer shall ensure that EMS personnel are called to the scene. While awaiting arrival of EMS personnel the Police Officer shall closely monitor the person and not leave the person unattended.

3. Persons restrained with their hands behind their back may be at a higher risk of death when kept in a prone position; therefore, it is the policy of the Department to avoid keeping a person in a prone position. Police Officers shall sit the person in an upright position as soon as it is safe to do so. If it is necessary to leave a restrained person on the ground, **immediately** position the person so he/she lay on their left side.

4. The arresting officer will notify detention personnel of any abnormal behavior and/or traits that the person is/was exhibiting when the person is released to detention personnel.

5. After a high-risk prisoner is released to the Jail, the Detention personnel shall closely monitor the person. Detention personnel shall call for EMS to respond to the jail should the person's behavior re-manifest.

D. Jail Restraint Options

1. Occasionally a prisoner must be prevented from harming him/her self or others. This can be accomplished by limiting the prisoner living space or by restricting his/her capacity for physical movement. The process of booking a person into the jail will be delayed until the person is cooperative.

2. Limited Living Space

    For certain kinds of harmful or disruptive behavior, confining the prisoner to a single cell for a short period may be all that is necessary. A prisoner who has an emotional outburst and physically threatens another prisoner or a Detention Officer may often be effectively handled simply by securing the prisoner in a single cell until he/she calms down.

3. Psychological Holding Area

    This holding area is fully padded with a toilet and in full view of the Central Control Station for monitoring. A combative prisoner, who is out of control, should be placed in this area until he/she becomes cooperative and can be removed without causing injury to themselves or others.

4. Restraining Chair

    The restraining chair will be used only as a means of restraint when handling prisoners who display violent behavior toward themselves or other and Psychological holding has not been effective. Under no circumstances will the chair be used as a means of punishment. The prisoner is to remain confined in the restraint chair only until he/she has calmed, is willing to cooperate and poses no threat to self or others.

    a. The booking floor will be cleared of all activity when the restraint chair is in use. The chair will be placed in an area where the prisoner can be closely monitored by jail personnel and is not in plain view of other prisoners.

    b. When the prisoner can be released from the chair, the Detention Officer will examine him/her for injuries sustained while in custody. The Detention Officer will be responsible for acquiring any needed medical attention including transportation to a medical facility. If the prisoner can be assigned a cell, the Detention Officer should follow through with

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991　　　　　　　　　　**REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

　　　　standard jail procedures and complete the book-in process.

E. Oleoresin Capsicum (OC)

　　1. Oleoresin Capsicum (OC) spray is an inflammatory agent derived from the fruit of plants in the Capsicum genus. It is packaged in a pressurized aerosol spray. Research shows that when OC spray is used to subdue a potentially violent or violent person, the likelihood of continued resistance by the person is lessened, thus lessening the chance that the employee or the person will be injured.

　　2. Employees whose duties require them to carry OC spray are authorized to use OC spray only after successful completion of a Department approved OC spray training course. During training, the individual employee may choose to be exposed to OC spray in a controlled setting. An employee's exposure to OC spray is not a requirement to complete the training course.

　　3. The use of OC spray is considered use of force at the Pain Compliance level on the Confrontational Continuum. A Police Officer or Detention Officer who is justified in using OC spray against a person is not prevented from using greater force against that person if he/she reasonably believes greater force is necessary and justified by Department policy to achieve his/her lawful duty.

　　　　a. OC spray should not be used as "punishment" or as a coercive tool after a person is under control.

　　　　b. Under most circumstances, OC spray shall not be used on persons who are handcuffed unless the person is resisting to the point that lesser force options have failed.

　　　　c. OC spray shall not be used in riots, demonstrations or other civil disorders, except under the direction of a Lieutenant or a higher-ranking Commander.

　　　　d. Employees shall not ~~in~~discriminately use OC spray. Such use is unnecessary force.

　　　　e. OC spray shall not be used in the mere anticipation of violence or resistance unless the employee has articulable justification (i.e., statements by the person that he/she intends to resist arrest or assault the employee, the person exhibits agitated or aggressive behavior or the person's size, strength, and/or level of intoxication). Time permitting, the person should be verbally advised that he/she will be sprayed with OC if he/she resists or continues combative actions.

　　　　f. Ideally, OC spray should be used at a distance of four to six feet from the intended person and directed at the face. A one to two second burst of OC spray should control most persons. Employees shall use only the amount of OC spray reasonably necessary to stop a subject's physical aggression or resistance.

　　　　g. Employees using OC spray must use caution to avoid spraying other employees who may be near the person. Employees should warn others they are about to use OC spray by shouting "Pepper" in a loud voice. After spraying a person, allow 5-10 seconds for the majority of the OC spray to disperse before moving in to handcuff the person.

　　　　h. Employees shall be cognizant of the adverse reactions that a person may have when exposed to OC. Persons exposed to OC should be moved to an area that is well ventilated with fresh air, preferably outside. The person should be verbally reassured that the effects of OC are temporary. The employee should encourage the person to relax and take deep breaths.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991  **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

  i. Arrested persons who are exposed to OC shall be transported to the jail as soon as possible. Persons exposed to OC should recover in 15-30 minutes simply by flushing the exposed areas of the body with cool water. Upon arrival at the jail, the person may be allowed to rinse affected areas of the body in the jail shower if, in the opinion of the arresting officer, it is safe to allow the person to do so. No ointment or lotions of any type should be applied to the bodily areas exposed to OC since this will only trap the OC. EMS personnel shall be called for persons that continue to exhibit the effects of OC for more than 45 minutes after exposure.

  j. Police Officers who have custody of an arrested person that was exposed to OC shall clearly advise detention personnel, medical personnel and other employees that the person was exposed to OC PRIOR to these personnel coming into physical contact with the arrested person.

4. Officers shall be cognizant that the use of OC Spray on certain individuals may result in an unusual or severe reaction to the spray. OC Spray should generally not be used on the following persons:

   a. Children under the age of 12 years due to lack of respiratory development.

   b. Elderly persons due to health considerations.

   c. Women who are pregnant.

   d. Persons holding an infant or small child.

   e. Asthmatic persons. While the use of OC Spray on Asthmatic persons is not known to cause any unusual effects, it should be considered by the officer that use of OC Spray may trigger and asthma attack due to excitement or fear.

5. Police Officers of the rank of Sergeant and below and Public Safety Officers shall carry OC spray. Police Officers in the rank of Lieutenant and above and Crime Scene Personnel have the option to carry OC spray. Detention Officers will have OC spray available for use in the Jail.

   a. Uniformed Police Officers, Crime Scene Personnel and Public Safety Officers shall carry the OC spray canister on the duty belt in the issued carrier. Canisters of OC spray shall not be left in patrol vehicles nor be exposed to extremes of temperatures that could cause the pressurized canisters to burst.

   b. Canisters of OC spray shall be replaced whenever the canister will not effectively deliver the product, upon expiration of the manufacturers recommended shelf life or upon a malfunction of the canister.

   c. Employees shall not carry OC spray into jail. The employee will place the canister in a gun locker prior to entering the jail area.

F. Chemical Munitions

1. The Tactical Team has access to a variety of hand tossed and 37mm launched chemical rounds consisting of OC, CS gas and combination OC/CS for use during civil disturbance and Emergency Services Unit (ESU) callouts. An incident commander in the rank of Captain or higher shall make the decision to deploy these weapons during civil disturbances. If a Captain is not available, an incident commander in the rank of Lieutenant is authorized to make the decision to deploy chemical munitions during civil disturbances and ESU callouts.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**              **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

   2. The Tactical Team will designate team personnel to receive external training on the specific munitions in the department's inventory.  A sufficient number of team members shall be trained on each team so that personnel familiar with the use, capabilities, and hazards of these munitions are available during a critical incident.

G. Use of Police Impact Weapons

   1. Uniformed Police Officers of the rank of Sergeant and below shall carry the department approved baton or department approved alternate baton, after completion of the department sanctioned course of training.

   2. The baton shall be used only when a lesser level of force on the Confrontational Continuum has proved ineffective in overcoming resistance by a person, or the lesser level of force would be unsafe or inappropriate; or in the protection from an assault by any person.

   3. Police Officers shall not use the baton to strike a person's head, neck/throat, back/spinal area or groin unless the use of lethal force is justified by department policy.

   4. Employees are prohibited from carrying the following impact weapons:

      a. Slapper

      b. Saps

      c. Weighted Gloves

      d. Knuckles

      e. Other similar type weapons

   5. The department issued or approved flashlight may be used as an impact weapon when the standard baton is not readily available.  When a Police Officer uses the flashlight as an impact weapon, the officer shall adhere to the Department's policy on use of force.  Police Officers shall be trained in the appropriate use of the flashlight as an impact weapon.

H. TASER

   1. Only Police Officers who have successfully completed a department approved TASER training course are authorized to carry and use the TASER.  Police Officers shall carry and use only department issued TASERS.

      a. Plano police TASER instructors will not provide a TASER exposure to any person for training or demonstration purposes.

      b. Plano police employees are not authorized to receive a voluntary TASER exposure for training or demonstration purposes. *TASER exposure* includes the use of probes, alligator clips, affixing probes to the skin, and drive stuns.

   2. The TASER is an effective defensive weapon, which fills the void allowing standoff incidents to be handled in a safer method, both for Police Officers and for the person.  The TASER can be used to control dangerous or violent persons when deadly force does not appear to be immediately justified.

   3. When deploying the Taser, do not aim at the chest.  The aiming point on the front of the body is below the chest, center mass between the sternum and waistline. It is understood that in dynamic situations, unintentional impacts to the chest could occur but efforts must be made to avoid chest impacts.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**            **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

4. Use of a cover officer during Taser deployment should be considered for officer safety purposes.

5. The TASER may be used as a touch-stun device.  When used in this mode, the use of the TASER is subject to the same guidelines and restrictions when used during cartridge deployment. The frontal area is an approved impact area. The chest area should be avoided. It is understood that in dynamic situations, unintentional impacts to the chest could occur but efforts must be made to avoid chest impacts.

6. **A TASER application shall not exceed five (5) seconds.**

7. Officers utilizing the TASER shall activate it for one standard cycle (5 seconds) and immediately attempt to control and restrain the subject to minimize the necessity of an additional cycle.  Officers may activate an additional cycle (up to a maximum of two) only if the person continues to be an immediate threat to himself or others and a lesser force option would be ineffective or unsafe. The TASER shall not be activated more than two times on any single subject unless the person continues to be an immediate threat to himself or others and the person has the means to commit serious bodily injury or death to himself or others.

    a. After deploying the TASER on an individual, assess their condition and re-evaluate the threat before actuating the TASER again.

    b. It is imperative that each activation of the TASER (i.e. each trigger pull) must be justified independently under current Plano PD Use of Force policy and the actions of the violator must rise to the level of force justifying the use of the TASER upon each individual activation.

8. Certain individuals may be more susceptible to serious injury from a TASER application; therefore, the TASER shall not be used against the following persons unless the person is an **immediate** threat to themselves or others and the person has the means to commit serious bodily injury or death to themselves or others.

    a. Females known or suspected of being pregnant.

    b. Persons holding or carrying an infant.

    c. Children known, or who appear to be younger than twelve (12) years of age.

    d. Persons known, or who appear to be older than 70 years of age.

    e. Persons known or suspected of wearing a pacemaker.

    f. Persons in handcuffs.

9. The TASER shall not be used on a person where a fall may cause serious bodily injury or death, **unless** the person is an immediate threat to others **and** the person has a means to commit serious bodily injury or death to others.

10. A person may not be able to respond to commands during or immediately following a TASER shock.  Subjects should be secured as soon as practical while disabled by the TASER charge.

11. The TASER shall not be used in the presence of flammable liquids, vapors or sensitive explosives.

12. In every instance where the TASER is used, including the touch-stun mode, EMS personnel shall transport the person to a hospital for medical evaluation and removal of probes.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**          **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

13. Photographs shall be taken of persons who are exposed to a TASER charge as soon as possible.  The photographs should show the person's injuries, or the lack thereof, and the point of contact of the TASER probes.  If possible, photographs should be taken before the removal of the probes.  The photographs shall be placed into evidence.

14. The expended TASER cartridge and probes shall be collected and placed in evidence.

15. Professional Standards Unit personnel shall download the TASER data port after each use and forward the TASER usage report with the Use of Force Report during the review process.

16. Police Officers assigned a TASER are responsible for inspection of the TASER at the beginning of their shift.  Police Officers are required to wear the TASER in a department issued or approved holster on the opposite side of the body that the duty firearm is worn.

17. Under no circumstances shall any employee tamper with or alter in any manner any department issued TASERs or TASER cartridges.  Police Officers shall use TASER International brand cartridges only with department issued TASERs.

I. SAGE Less Lethal Launcher System

1. The SAGE Less Lethal Launcher System provides Police Officers an option of less lethal force that can be used with greater accuracy and at a greater distance.  In every instance, the use of the SAGE Less Lethal System shall be reasonably necessary and comply with Departmental policy.

2. Only personnel who have successfully completed a departmentally approved training course in the proper use and deployment of the SAGE Less Lethal Munitions System shall be authorized to use the SAGE Launcher System during actual police operations.  Police Officers are required to qualify with the SAGE Launcher on an annual basis.

3. No member of the Department shall attempt to use the SAGE Launcher System without having a cover officer with a lethal option available.

4. When any person is struck with a baton round that has been launched from the SAGE Launcher, EMS Personnel will be called to the scene to evaluate injuries.

5. All SAGE launchers assigned to the Patrol Services Division shall be stored loaded in the hard storage case, designed for this purpose, in the trunk of the patrol supervisors' vehicles.  Patrol supervisors or deployment officers shall be responsible for checking the weapon at the beginning of each shift to ensure that it is loaded.

6. Under no circumstances shall any person tamper with or alter in any manner any less lethal impact projectiles.  Only factory-loaded rounds will be used during actual police operations.  Reloads will only be used for training and qualification purposes.

J. Use of Neck Restraints

**Employees of the Department are prohibited from using neck restraints unless the use of lethal force is justified by Department policy.**

K. Weapons Positions

1. Philosophy:

    a. The two pillars of firearms safety are trigger control and muzzle control. The Plano Police Department stresses the importance of trigger and muzzle control through identifying and defining the four (4) weapon positions below, consistency in training, and the reporting of

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991  **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

Use of Force incidents. These pillars are consistent with the four (4) firing range safety rules (SOP 401.001). The muzzle of an officer's weapon should never be intentionally pointed at any person unless the officer reasonably perceives the person to be an immediate deadly threat.  An officer's finger should never be in the trigger guard unless the officer is intending to immediately fire his weapon.

2. PRPTC Firing Range Safety Rules (See also SOP 401.001)

    a. Treat all weapons as if they are loaded.

    b. Always point the weapon in a safe direction (muzzle down range).

    c. Keep your finger outside the trigger guard until sights are on target and you are prepared to fire.

    d. Be sure of your target and the environment behind and around it.

3. Positions:
    a. **Holstered/Secured** – Handgun is secured within the officer's holster and under the officer's immediate control. Rifle/Shotgun is locked into the patrol vehicle's rifle rack or it is placed inside of a case and secured with a cable.

    b. **Un-holstered/Safety Circle** – Handgun is held by the officer in a fashion described as the "safety circle." The safety is on and the trigger finger is outside of the trigger guard. The officer should maintain at least one hand on the weapon at all times. This position includes the slinging and "hanging" of long guns (shotguns and rifles) when the officer is at rest.

    c. **Ready** – Handgun is held so that the muzzle is pointed outside of the "safety circle," but the muzzle is not intentionally pointed at any person. The safety is on and the trigger finger is outside of the trigger guard. There is no immediate deadly threat but an officer reasonably believes they may encounter an immediate deadly threat. Ready position is also used after an immediate deadly threat is over (scanning) or when the officer is relatively sure the immediate deadly threat has passed. This position reduces reaction time and the officer is prepared to instantly respond to an immediate deadly threat.

    d. **On-Threat** – Weapon is held so that the muzzle is purposely pointed at a person reasonably perceived to be an immediate deadly threat. The safety remains on while the trigger finger is outside the trigger guard unless the officer is intending to immediately fire his weapon. For shotguns, the safety can be off.

L. Use of Lethal Force

1. Police Officers are equipped with firearms to defend themselves and others against deadly force and when it is reasonably necessary to do so, to affect the arrest of an escaping or fleeing felon, ensuring such Use of Force is in compliance with Departmental Directives. When a Police Officer discharges a firearm, it must be with the realization that the death of a person may occur, not necessarily with the intent that such will be the result.

2. Justification for the use of any form of deadly force is limited to what reasonably appears to be the facts known or perceived by a Police Officer at the time the officer decides to use such force.  Facts unknown to a Police Officer, no matter how compelling, cannot be considered in later determining whether the shooting was justified.

3. A Police Officer is not justified in the use of deadly force to protect him/her self or others from assaults that are not likely to result in death or serious bodily injury.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991  **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

4. In the event any use of force by a Police Officer results in the death of or serious bodily injury to an individual, that officer will be reassigned from line duty assignment pending the completion of an administrative review of the incident. However, if there is sufficient information to show that the use of force was justified and complied with Department policy, the Chief of Police may make the decision to return the officer to full duty before the completion of the administrative review.

5. Police Officers are permitted to discharge a firearm only under the following circumstances:

    a. At an approved target at an approved shooting range.

    b. For target practice or recreational shooting in areas where shooting a firearm is safe and it is not in violation of any statute or ordinance.

    c. At any animal that is obviously mad or vicious and otherwise cannot be stopped from killing or seriously injuring a person.

    d. To euthanize a critically injured animal. Prior to euthanizing the animal the Police Officer shall make every reasonable attempt to locate and receive permission from the animal's owner, seek and receive supervisory approval and ensure that the discharge of the firearm will not endanger any person or other property.

    e. In self-defense or in the defense of another person from what reasonably appears to be the use or imminent use of deadly force or the immediate danger of serious bodily injury.

    f. At another person to effect an arrest or to prevent the escape from custody a person who the Police Officer has probable cause to believe committed a felony involving the use of a deadly weapon, **and**

        (1) the person is attempting to escape by using a deadly weapon, or the person otherwise poses an imminent threat of death or serious bodily injury to another person; **and**

        (2) the use of deadly force is necessary to prevent the escape and all other means of apprehension have been exhausted or would obviously be unsuccessful if attempted; **and**

        (3) a verbal warning, where practical, was given to the escapee.

6. Police Officers are **NOT** permitted to discharge a firearm in the following circumstances:

    a. As a warning shot to induce the surrender of any person or for any other reason.

    b. At persons who have committed only a misdemeanor or traffic violation.

    c. Merely to prevent the destruction or theft of property.

    d. To halt any person who simply runs away to avoid arrest.

    e. When it appears reasonably possible that an innocent person could be shot.

    f. On the mere suspicion that a person committed a crime, no matter how serious.

    g. At moving vehicles. **Exception:** As a last resort and only when deadly force is justified by Department policy.

        (1) The mere assumption that a fleeing vehicle is a deadly weapon and may cause injury to an officer or citizen is NOT justification for a Police Officer to discharge a firearm toward the vehicle, at the driver, or the occupants.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:** October 18, 1991          **REVISION DATE:** June 10, 2016
**REVIEW SCHEDULE:** Annual
**AFFECTS:** All Personnel

---

       (2) When justified by Departmental policy to shoot at a moving vehicle, Police Officers shall consider all risks before doing so.

  7. Police Officers shall use threats of deadly force only when reasonably necessary.

  8. Reducing the Risk of Death

     a. Regardless of the nature of the crime or the legal justification for shooting at a person, Police Officers are reminded that their basic responsibility is to protect the public. Police Officers are instructed to be particularly cautious when shooting under conditions that would subject innocent bystanders to danger.

     b. In the extreme stresses of a shooting decision, a Police Officer may not have the opportunity or ability to direct the shots to a non-fatal area. To require the officer to do so could increase the risk of harm to the officer or others.

  9. Surrender of Weapon

    Police Officers are strongly discouraged from ever surrendering their weapon. The ultimate decision to surrender one's weapon must be made by each individual officer involved, based upon the circumstances that surround the incident.

  10. Use of Police Vehicles

    Police Officers shall not use a police vehicle as a roadblock, to ram or to force another vehicle off the roadway, except as a last resort and only when deadly force is authorized by Department policy. When a Police Officer is authorized by Department policy to collide with or pull in front of a vehicle, the Officer shall consider all risks before doing so.

M. Reporting Use of Force

  1. A Use of Force Report shall be completed for each use of force incident. All appropriate reports will be attached. Each involved employee will be named in the Use of Force Report. Each employee using force or witnessing the incident shall complete a supplement report documenting his or her actions and observations. In the event of an ESU response or Narcotics Operation, the ESU Tactical Report or Narcotics Debriefing Report (as applicable) will suffice in lieu of individual supplemental reports. All reports shall be completed as soon as possible after the incident, but in all cases prior to the end of the shift. This applies to incidents that occur during an employee's tour of duty or when an employee is off duty utilizing his/her law enforcement authority. The involved employee shall be responsible for notifying an on-duty supervisor immediately after using force. The supervisor shall complete the Use of Force report prior to the end of his or her shift.

  2. A Use of Force Report shall be completed in the following circumstances:

     a. When using any degree of force or physical restraint which, by the nature of its use, causes, or has the likelihood to cause bodily injury, serious bodily injury, or death.

     b. When an employee purposely strikes a person either with personal weapons or impact weapons.

     c. When an employee uses OC Spray or a chemical agent.

     d. When a Police Officer points or uses a TASER.

     e. When a Police Officer points or uses the SAGE Launcher.

     f. When a Police Officer presents his firearm in the "ready" or "on-threat" position in the presence of a suspect or the public within the scope of their law enforcement authority.

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**       **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

- g. When a Police Officer presents his firearm in the "un-holstered/safety circle," "ready," or "on-threat" position while not in uniform or "approved departmental attire" but in the presence of a suspect or the public.  "Approved department attire" is defined in this section as a shirt, vest, or jacket that is designed to clearly identify the wearer as a police officer by the word "POLICE" being prominently visible on the front and back.

- h. When a Police Officer discharges a firearm in his/her law enforcement authority, for other than training or recreational purposes.

- i. When a Police Officer causes bodily injury to a person.

- j. When a person complains of bodily injury resulting from any type of police action involving a physical confrontation.

- k. When a Police Officer threatens a person with deadly force. Merely placing a hand on the firearm does not require a Use of Force Report.

- l. When a canine is used to physically subdue a person.

- m. In the event of an ESU response.

- n. When a prisoner is restrained in the Restraint Chair.

- o. For any reason not listed above, that a supervisor deems necessary, a review should be done.

Note: The Watch Commander or supervisor on duty shall make the final decision as to the appropriateness of completion of the Use of Force report.

3. The Chief of Police may require a review of an incident where force was used at his/her discretion.

4. The Use of Force Report, all official reports and recordings shall be reviewed by the employee's chain-of-command to determine whether the use of force complied with department policy.

5. Upon review of a use of force incident, the employee's chain of command will report its findings, relevant to the following aspects of the incident.

    a. Whether the force used was:

        (1) Within policy

        (2) Out of policy

        (3) Accidental

    b. Any relevant tactical considerations:

        (1) Drawing and exhibiting firearms, if applicable

        (2) Firing of weapon or application of force

        (3) Tactics prior to the use of force

        (4) Tactics during and following the use of force

        (5) Any relevant training considerations

    c. The quality of supervision prior to, during and after the incident

    d. Any relevant discipline considerations

**ADMINISTRATIVE DIRECTIVE – 112.008**
**USE OF FORCE**

**EFFECTIVE DATE:  October 18, 1991**             **REVISION DATE:  June 10, 2016**
**REVIEW SCHEDULE:  Annual**
**AFFECTS:  All Personnel**

   e.  The post-incident investigative processes and quality

6. The Division Commander will determine whether the use of force occurred in a manner consistent with policy and, where appropriate, disciplinary action.  The Chief of Police will have final review of all Use of Force incidents involving death or serious bodily.

7. The Division Commander will notify the involved employee and his/her chain of command of the disposition of the review and forward the completed Use of Force report including any original documentation to the Professional Standards Unit.

8. The Professional Standards Unit shall maintain a file on completed Use of Force reviews. The Professional Standards Unit Sergeant shall submit a quarterly and cumulative statistical report regarding Use of Force incidents to the Office of the Chief of Police.  The annual report will include analysis of any problem areas identified, which indicate a need for further training or an adjustment of written directives or procedures.